7 September 2000

NO. 4-98-1035

IN THE APPELLATE COURT 

OF ILLINOIS

FOURTH DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from

Plaintiff-Appellee, ) Circuit Court of

) Macon County

THOMAS E. STREET, ) No. 97CF1327

Defendant-Appellant. )

) Honorable

) John L. Davis,

) Judge Presiding.

_________________________________________________________________

JUSTICE MYERSCOUGH delivered the opinion of the court:

In October 1998, the State charged defendant, Thomas E. Street, 
inter
 
alia
, with sexually assaulting (720 ILCS 5/12-

13(a)(1) (1998)) D.P., whom defendant had dated previously.  At trial, defendant asserted consent as an affirmative defense.  D.P. testified for the State, admitting that she and defendant had previously engaged in consensual sex but maintaining that on the night in question she did not consent.  On cross-examination, defendant asked the victim about the sexual relationship and, during his own case, offered witnesses who, in part, contradicted D.P.'s answers regarding the relationship.  At the close of all the evidence, the court
 requested oral argument on the applica

bility of Illinois' "rape shield" statute, section 115-7 of the Code of Criminal Procedure of 1963 (Criminal Procedure Code) (725 ILCS 5/115-7 (West 1998)).  The court
 declared a mistrial over defendant's arguments that the statute did not apply.  The court later denied defendant's motion to bar a retrial on double jeopardy grounds.  Defendant appeals, arguing that (1) section 115-7 of the Criminal Procedure Code did not prevent him from introducing evidence of the prior romantic relationship with D.P. where D.P. acknowledged that such a relationship had existed, and (2) the trial court erred in declaring a mistrial since no manifest necessity required it.  We reverse.

I. BACKGROUND

During the evening of October 10, 1997, police arrested defendant for sexually assaulting a woman, D.P., with whom he had had a brief prior relationship.  D.P. alleged that defendant arrived at her apartment around midnight on October 10, 1997, and the two engaged in conversation for 30 to 60 minutes outside her front door.  Afterward, both parties went into D.P.'s apartment.  D.P. had been entertaining another male guest who left without incident shortly after defendant came inside.  

According to D.P.'s testimony, she and defendant began having consensual sex near the stairs in D.P.'s apartment.  The pair moved upstairs to D.P.'s bedroom, where defendant began to get "a little rough."  D.P. said defendant penetrated her anally with his fingers and then with his penis despite her continual crying and repeated requests that he stop.  D.P. later went to the emergency room where she was treated for superficial abra

sions and tears to her vagina and rectum.

Defendant asserted consent as a defense, and the State did not deny that D.P. and defendant had been romantically involved.  During opening statements, the prosecutor remarked that "[D.P.] had known [defendant] for several months[] [and] had dated [him] for a while."

During opening statements for the defense, counsel stated: 

"[I]n this particular case there has never been a denial that there was sexual inter

course *** between Mr. Street and [D.P.].  In fact, these people had seen one another for several months before.  This case comes down to a case of whether or not the consensual aspect of sex was present [on] October 10."

Defense counsel went on to comment about what D.P. had told her coworkers about defendant:

"[D.P.] claims that she had not seen [defendant] for a couple of weeks. Well *** Sarah [Kozak] will tell you of a conversation that occurred in the break room at [work] two to three days before this allegation was *** made against [defendant.] [D.P.] basically announces that she and Mr. Street[,] the night before[,] had *** sex and that it was of such a nature that they broke the bed, that she commented upon how large he was, and she commented like she had ridden a bull all night. *** Miss Kozak will tell you that *** there had been a handful of other times *** when [D.P.] had talked about dating [defen

dant], talking about they had sex frequently, talking about the fact that he was hung like a horse."

During the State's case in chief, they called D.P. to testify.  She admitted that she and defendant had dated for a short time and had engaged in consensual sex.  The following dialogue occurred:

"A. Well, I don't know--we were together a couple of times, like twice, three times.

Q. Did you go to the show, did you go out to eat?

A. No, we didn't.

Q. So what kind--what was the nature of your relationship?

A. I guess it was just sexual, I guess?"

The prosecutor also questioned D.P. regarding the nature of her sexual relationship with defendant: 

"Q. Now, you said that you did have a relationship with [defendant] before you decided you were going to tell him it was over.  This sexual relationship that you had with him before, had it ever *** involved anal sex?

A. No.  This is something I have never done before in my life.

Q. Did you want it?

A. No."

On cross-examination, D.P. admitted that her relationship was a  sexual one and that defendant was "well endowed," but she main

tained that they had only engaged in consensual sex on two prior occasions.  Furthermore, D.P. denied telling her coworker Kozak any details of her relationship with defendant.

During the defense's case, Kozak testified that two or three days before October 10, she and D.P. were in the break room discussing D.P.'s relationship with defendant.  In particular, defense counsel asked Kozak about particular statements D.P. allegedly made:

"Q. Did she make the statement involving her and [defendant] that she felt like she had [ridden] a bull all night?

A. Yes.

Q. Did she make a statement commenting upon how well endowed and large Mr. Street was?

A. Yes.

Q. Did she make a statement that they had broken the bed having sex?

A. Yes.

***

Q. Did she ever make the statement on that occasion that he was hung like a horse?

MS. BOLTON [(assistant State's Attor

ney)]: Objection.

THE COURT: Sustained.

MS. BOLTON: Move to strike.

THE COURT: It's stricken.

Q. Did she ever tell you that they had sex frequently?

A. Yes.

MS. BOLTON: Objection, your Honor.

THE COURT: Sustained.

MS. BOLTON: Request that the jury be instructed to disregard.

THE COURT: Please disregard the question and the answer of the witness, ladies and gentlemen."

Subsequently, a discussion ensued, out of the jury's presence, between defense counsel and the trial judge regarding the evidentiary avenues that defense counsel was pursuing.  The court made the following comments:

"THE COURT: *** I'm not going to permit this to go any further.  As a matter of fact, I'm very close to a mistrial on my own mo

tion.  That, together with the previous an

swer of this and the prior witness.

As I understand it, the theory of the defense is there's been prior consensual sex here, but, other than what the victim has testified to.  And I believe that [the rape shield law (725 ILCS 5/115-7 (West 1998))] has been violated."

The next day, defendant testified that he and D.P. dated for a couple months prior to October 10 and that they usually saw each other "once a week, maybe more than that."  Defendant further testified that he had been with D.P. at her house only two or three days before October 10.  Defendant further confirmed that D.P.'s description of their relationship as "sexual" was accurate.  Defendant testified that, on the night in question, D.P. performed oral sex on him at the bottom of her stairs before the two went up to her bedroom.  He acknowledged that he penetrated her anally with his penis but denied inserting his finger in her anus.  Moreover, defendant stated that he did not force D.P. to perform any of the sex acts involved and that at no time did she ask him to stop.

After the defense rested, the court requested 
ad
 
hoc
 oral argument from both counsel regarding the applicability of section 115-7 of the Criminal Procedure Code to the current proceedings.  The following ensued:

"MR. MATTINGLEY [(defense counsel)]: May it please the court.  Your Honor, first, let me say that I think the whole reason of this section, at least in part, is that we have to look to the idea that the subject isn't to be broached unless *** the victim denies prior sexual activity.

THE COURT: Which she has done.

MR. MATTINGLEY: She has admitted--in fact, the State elicited the testimony.

THE COURT: Mr. Mattingley, [s]he has admitted two prior encounters.

MR. MATTINGLEY: That's correct.

THE COURT: Your theory and your [impli

cation] made by the testimony of the defen

dant is that is not true.  There were numer

ous encounters.  That's the inference you have before this trier of fact.  That's the reason this statute comes into play.  Because the court, in order to prohibit evidence exactly of the kind that you are suggesting, must find that there are certain facts that support that evidence.  And there are none.

MR. MATTINGLEY: Judge, that is not an inference that I am going to argue.  I am confining myself, and I will tell the court right now, I am confining myself to the fact that she has acknowledge[d] that they had a relationship and that she has acknowledged that they had two prior sexual acts.

THE COURT: And the inference from your client's testimony is that there were not only two, there were many.

MR. MATTINGLEY: He never testified that there was anything more than they saw each other frequently, maybe once a week.  Is it correct the relationship was sexual?

* * *

THE COURT: The inference before the trier of fact by this line of questioning *** is that there were numerous prior encounters of [a] sexual nature.  You may not have asked the question specifically *** but your very good defense tactics, which you are very good at; I'm not disputing that, you left the trier of fact with an inference that there were numerous prior sexual encounters."

The court further advised defense counsel that in its opinion "[the] court must declare a mistrial in this case."  At one point, the prosecutor interjected and proposed that a cura

tive instruction might remedy any statutory violation, but she later moved for a mistrial, which the court immediately granted.  The court denied defendant's motion to dismiss the reinstated prosecution on double jeopardy grounds.  In so doing, the court noted that "there was no way to cure the error.  The court could not *** adequately instruct the [jurors] that they were not to consider the evidence."  This appeal followed.

II. ANALYSIS

A state may not put a defendant in jeopardy twice for the same offense.  
Arizona v. Washington
, 434 U.S. 497, 503, 54 L. Ed. 2d 717, 726, 98 S. Ct. 824, 829 (1978).  The constitu

tional protection against double jeopardy (U.S. Const., amend. V) attaches after the jury is selected and sworn.  
People ex rel. Roberts v. Orenic
, 88 Ill. 2d 502, 507, 431 N.E.2d 353, 356 (1981).  Since jeopardy attaches before the judgment becomes final, the constitutional protection embraces a defendant's right to complete his trial before a particular tribunal.  
Washington
, 434 U.S. at 503, 54 L. Ed. 2d at 727, 98 S. Ct. at 829.  Thus, where a court, acting without defendant's consent, declares a mistrial, the court necessarily deprives defendant of his "valued right" to have a particular jury decide his fate.  
United States v. Jorn
, 400 U.S. 470, 484, 27 L. Ed. 2d 543, 556, 91 S. Ct. 547, 557 (1971).  However, by declaring a mistrial, a court does not necessarily preclude a second trial.  Rather, reviewing courts should examine the facts of each case to determine the propriety of a double jeopardy claim.  
Orenic
, 88 Ill. 2d at 507-08, 431 N.E.2d at 356.  When a trial court declares a mistrial without the defendant's consent, the reviewing court should allow the State to retry a defendant only if the facts demonstrate that a manifest necessity required declaring the mistrial.  
Orenic
, 88 Ill. 2d at 508, 431 N.E.2d at 356. 

Defendant urges us to conclude that no manifest neces

sity existed for the trial court's mistrial declaration because he did not violate Illinois' rape shield statute.  However, we need not reach defendant's substantive argument, as our own analysis of the procedure surrounding the court's actions in this case indicates that the judge failed to exercise sound judicial discretion in determining whether manifest necessity warranted declaring a mistrial.

The doctrine of manifest necessity stands as a command to trial judges not to foreclose the defendant's right to have a particular tribunal decide his fate until a scrupulous exercise of judicial discretion leads to the conclusion that the ends of public justice would not be served by continuing the proceedings.  
Jorn
, 400 U.S. at 485, 27 L. Ed. 2d at 557, 91 S. Ct. at 557.  Essentially, in determining whether manifest necessity exists, the trial court must balance the defendant's interest in having the trial completed in a single proceeding, reserving the possi

bility of obtaining an acquittal before that "particular tribunal," against the strength of the justification for declaring a mistrial rather than attempting to continue the trial to a verdict.  5 J. Israel, N. King & W. LaFave, Criminal Procedure §25.2(c), at 654 (2d ed. 1999).  

Deciding whether manifest necessity warranted a mis

trial should be based on the facts of each individual case.  In making its determination, a reviewing court may consider several factors, including (1) whether the difficulty was the product of the actions of the prosecutor, defense counsel, or trial judge, or was events over which the participants lacked control; (2) whether the difficulty could have been intentionally created or manipulated by the prosecution to strengthen its case; (3) whether the difficulty, prejudice, or other legal complication might have been "cured" by another alternative that would have preserved the trial's fairness; (4) whether the trial judge actually considered the alternatives to a mistrial; (5) whether a subsequent conviction would be subject to reversal on appeal; (6) whether the trial judge acted in the heat of the trial confronta

tion; (7) whether the trial judge's decision rested on an evalua

tion of the demeanor of the participants, the "atmosphere" of the trial, or any other factors that similarly are not amenable to strict appellate review; (8) whether the trial judge granted the mistrial solely for the purpose of protecting the defendant against possible prejudice; (9) whether the evidence the State presented, prior to the mistrial, suggested a weakness in its case (
e.g.
, a witness failed to testify as anticipated); (10) whether the jurors had heard enough of the case to formulate some tentative opinions; (11) whether the case had proceeded so far as to give the prosecution a substantial preview of the defense's tactics and evidence; and (12) whether the composition of the jury was unusual.  5 J. Israel, N. King & W. LaFave, Criminal Procedure §25.2(c), at 654-55 (2d ed. 1999).

In 
Jorn
, the defendant was tried for willfully assist

ing in the preparation of fraudulent income tax returns.  At the trial's inception, the prosecutor called as a witness a taxpayer whom the defendant allegedly had aided in preparing the returns.  The trial judge warned the witness of his constitutional rights and the witness agreed to testify, stating that Internal Revenue Service (IRS) agents had so advised him when they initially questioned him.  The judge refused to allow him to testify until he had consulted an attorney, indicating that he did not believe the witness had been warned.  The prosecutor advised the judge that the witness, as well as the remaining witnesses, had been advised of his rights by the IRS agents.  Declaring that the warnings were "probably inadequate," the judge, 
sua
 
sponte
, declared a mistrial so that the witnesses could consult with attorneys.  In holding that double jeopardy considerations barred retrying the defendant, the Court noted that the trial judge had not exercised sound discretion in deciding whether manifest necessity existed for a mistrial.  Specifically, the Court pointed out that the trial judge failed to consider another option, such as a continuance, before declaring the mistrial.  
Jorn
, 400 U.S. at 487, 27 L. Ed. 2d at 558, 91 S. Ct. at 558.  

In the present case, although the State moved for a mistrial, it was an afterthought to the trial court's already expressed intention to declare a mistrial.  Thus, the court's declaration was tantamount to a 
sua
 
sponte
 mistrial declaration over opposing argument from defense counsel.   In addition, the court requested 
ad
 
hoc
 arguments from counsel, giving neither party adequate time to prepare cogent remarks regarding the applicability of the rape shield statute.  Furthermore, the State apparently did not want a mistrial since the prosecutor asked the court to administer a curative instruction and only later moved for a mistrial after it became apparent that the court was going to declare one on its own.  The record fails to demonstrate that the trial judge considered the State's suggestion of a curative instruction, or any other alternative, prior to declaring the mistrial and fails to show that the judge articulated any reasons for rejecting that alternative.  We conclude that the trial court failed to exercise sound discretion in determining whether manifest necessity required it to declare a mistrial and hold that retrying defendant under these circumstances for the same offense would violate the constitutional protection against double jeopardy (U.S. Const., amend. V).

III. CONCLUSION

For the reasons stated, we reverse.

Reversed.

COOK, P.J., and STEIGMANN, J., concur.