# Illinois Official Reports

## Appellate Court

---

### *People v. Shoevlin*, 2019 IL App (3d) 170258

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LINDA M. SHOEVLIN, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-17-0258 |
| Filed | January 3, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Will County, No. 16-CM-384; the Hon. Edward Burmila Jr., Judge, presiding. |
| Judgment | Reversed. |
| Counsel on Appeal | James E. Chadd, Peter A. Carusona, and Jay Wiegman, of State Appellate Defender's Office, of Ottawa, for appellant.<br><br>James W. Glasgow, State's Attorney, of Joliet (Patrick Delfino, David J. Robinson, and Mark A. Austill, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | PRESIDING JUSTICE SCHMIDT delivered the judgment of the court, with opinion.<br>Justices Carter and Lytton concurred with the judgment and opinion. |

**OPINION**

¶ 1     The State charged defendant, Linda M. Shoevlin, with two counts of domestic battery (720 ILCS 5/12-3.2(a)(2) (West 2016)), and the case proceeded to a jury trial. After both the State and defense counsel gave their closing arguments, but prior to the State's rebuttal argument, the trial court declared a mistrial. After the trial court set a date for a new trial, defendant filed a motion to dismiss on double jeopardy grounds. The court denied the motion. Defendant appeals, asserting that the trial court erred in denying her motion to dismiss the subsequent criminal complaint on double jeopardy grounds because no manifest necessity existed to declare a mistrial. We reverse.

¶ 2                                            FACTS

¶ 3     In February 2016, the State charged defendant with two counts of domestic battery (*id.*), alleging that she knowingly and without justification made physical contact of an insulting or provoking nature against her husband, Edward, when she struck him "about the head" (count I) and "scratched [him] about the body" (count II). The case proceeded to a jury trial in February 2017, in which both the State and the defense presented evidence.

¶ 4     During opening statements, defense counsel told the jury that Edward had a "very powerful reason" to accuse his wife of battering him because the two of them were in the middle of divorce proceedings and Edward wanted custody of their two young children.

¶ 5     Edward then testified as follows. He and defendant were separated; they have two children together. On January 21, 2016, after being separated for approximately 45 days, he gave defendant permission to spend a couple of nights sleeping on the couch at the house. Defendant "often came over to the marital residence and had dinner with [him] and the children." They had dinner as a family that night. After the children went to bed, they sat on the couch and talked "pretty much [about] how our status was, because we were separated at the time." He became upset when defendant told him she did not want to reconcile. At some point during their conversation, Edward asked defendant if he could take the children to his brother's house to visit, which would "be like only a six, seven hour, you know, journey back and forth." He felt that he should ask permission because he already told defendant she could see the children that weekend. At that point, defendant "got aggravated" and an argument ensued. Edward asked defendant to leave when the argument became "heated." He grabbed her keys from the counter to hand them to her, but instead of taking the keys, defendant grabbed his throat with both hands and dug her fingernails into it. He managed to pull away, but defendant followed him to the next room where she picked up her keys and struck him in the forehead with them. As Edward called 911, defendant took "one last swing" at his face, leaving a mark with her nails. The children's babysitter, not defendant, put the children on the bus the next morning and picked them up from the bus stop later that afternoon. Edward next saw defendant "probably over a week" later.

¶ 6     On cross-examination, Edward testified that he and defendant were in the process of divorcing and that he asked for custody of the parties' children in the petition for dissolution of marriage. The following colloquy then occurred:

> "Q. And at the time of this alleged incident, you guys hadn't decided who would get custody yet, correct?

A. She left.

Q. Let me repeat my question. Maybe you didn't understand. At the time of this incident you guys hadn't decided who would get custody of the children there, correct?

A. To answer, I would say I decided I was going to take—

Q. You—

A. The custody.

Q. —decided?

A. Yes.

Q. It's your decision to make?

A. At the time with the [Department of Children and Family Services] cases, yes."

¶ 7   On redirect-examination, Edward contradicted his earlier testimony that defendant "often came over to the marital residence and had dinner" with the entire family, stating that during their 45-day separation, defendant "wouldn't come" visit the children.

¶ 8   Felipe Flores, a patrol officer with the Crest Hill Police Department, testified that he was dispatched to the Shoevelins' home for a domestic disturbance. He described Edward as being "in a hysterical state, as if an argument just occurred." Flores observed scratches on Edward's face and neck, which he photographed. These photographs were admitted into evidence.

¶ 9   Defendant testified as follows. Although she did not live with them during her separation from Edward, she went to the marital home after work each morning to wake the children up and get them ready for school. She also picked them up from the bus stop every afternoon. On January 21, 2016, she picked the children up from the bus stop and took them back to the marital residence. Once there, she cooked dinner and helped with homework. After the children went to bed, she and Edward got into an argument about rekindling their marriage. Edward wanted to rekindle the relationship, but she did not. When she told him she was not interested, Edward raised his voice and yelled at her. He then told her "he was going to take the kids for the weekend," even though she made arrangements to have the kids for that weekend. After he told her she could not have the kids, she became upset and left the house. She denied scratching Edward or making any physical contact with him at all. The next morning, she went back to the marital residence, woke the children, and took them to the bus stop. Edward did not mention anything about the night before or that he called the police. Defendant could not recall any marks or other injuries to his face or neck.

¶ 10   On rebuttal, Edward testified that since their separation, defendant "sometimes" took the children to the bus stop in the morning and occasionally picked them up from the bus stop in the afternoon. According to him, defendant did not pick the children up from the bus stop on January 21, 2016. She did not arrive at the house until 5 p.m. that evening. Edward further denied that defendant returned to the home the next morning to take the children to the bus stop. Following the incident, Edward did not see defendant for "probably over a week." On cross-examination, Edward clarified that he, not the children, next saw defendant approximately one week after the incident. He stated, "she contacted me because she wanted to see the kids. And then at that time I had an order of protection out on her so she couldn't see me or the kids. So that's why she stayed away."

¶ 11    The closing arguments were not transcribed. According to the bystander's report, which summarized defense counsel's closing argument but not the State's, defense counsel told the jury that Edward had a "very powerful reason" to lie. Counsel stated that defendant

> "had been scorned and he wanted to break [defendant's] heart; he wanted to break her as a person and ruin her life. That's why after January 21, 2016[,] he came to this courthouse and filed dissolution of marriage. He wants to take the house from her, he wants to take her kids from her, and he wants to ruin her life. He knows that if she gets a conviction in this case, her kids are going to be taken away."

Counsel continued, "That's why he's making all of this up and why the State can't prove this case beyond a reasonable doubt. It didn't happen."

¶ 12    After defense counsel's closing argument, but before the State's rebuttal, the trial court addressed the parties outside the presence of the jury. The court expressed concerns that counsel's statement regarding defendant having her children taken away if she is convicted prejudiced the jury. According to the bystander's report, the court asked defense counsel:

> "[W]hy would you say that her kids are going to be taken away? Why would you say that? The jury now thinks that if she gets a conviction that as a function of law her kids will be taken away. I can't think of anything more prejudicial."

Immediately thereafter, the State moved for a mistrial.

¶ 13    The trial court then asked defense counsel on suggestions to remedy the situation. Counsel responded:

> "[I]n the context of my closing argument, where I made no other statements of law except that the State has to prove the case beyond a reasonable doubt, the jury will understand that I was referring only to [Edward's] state of mind in making up this story and not making an accurate statement of law."

The court disagreed with counsel. After recessing for five minutes, the court returned and announced:

> "I've thought about this and there are only two other things I could do, potentially. First, I could give an instruction telling the jury to disregard that statement, but then they will think that [defense counsel] was correct when he made that statement. I could give an instruction telling the jury to completely disregard [defense counsel] because he doesn't know what he's talking about, but that would completely prejudice the jury against the defendant and if [she] were convicted in this case [defense counsel's] ineffective assistance of counsel will be the first issue heard on appeal. I don't think [defense counsel] intentionally said what he said or that he wanted to prejudice the jury. He was doing very well up until that statement. I'm granting the mistrial."

¶ 14    After the trial court set a date for a new trial, defendant filed a motion to dismiss alleging that a new trial would violate the double jeopardy clause of the fifth amendment. He argued that the defense's theory of the case throughout trial was that Edward possessed a motive to lie and that, when taken in context, the statement at issue went toward Edward's intentions. Counsel also argued that the court failed to consider reasonable alternatives to granting a mistrial. Following a hearing, the trial court denied defendant's motion. In doing so, the court stated:

"Another thing that we tell [the jury] is that they cannot have sympathy for one side or the other in a jury trial. You can't get up there and say look at this poor woman, look what's going to happen to her if she gets convicted, which was the sum total of what it was that you said when you told the jurors remember, she gets convicted, she loses her children. You made an iron clad statement as if it was an *ipso facto* thing, conviction, loses the children.

Now, I know what you meant, and that isn't what you meant in a legal sense, but the jury couldn't make that distinction. And another thing we tell them is don't take the punishment into account, but you were telling them in advance take that into account. She gets convicted, she is losing her children."

The court did not believe that the instruction proffered by defense counsel could cure the error. It further announced, "the State's entitled to a fair trial, okay? They couldn't get up there and say whoa, whoa, whoa, wait a minute, she is not going to lose her kids, that's not going to happen, don't listen to that."

¶ 15    Defendant appeals.

¶ 16                                    ANALYSIS

¶ 17    Defendant argues that the trial court erred in denying her motion to dismiss the subsequent criminal complaint on double jeopardy grounds because no manifest necessity existed to declare a mistrial. In response, the State asserts that defendant cannot now claim double jeopardy where she failed to object to the court's declaration of a mistrial or file a "more timely" motion to dismiss the subsequent criminal complaint. Alternatively, the State maintains that it demonstrated a manifest necessity for the mistrial.

¶ 18                    A. Whether Defendant Acquiesced in the Trial Court's
                                    Declaration of a Mistrial

¶ 19    We begin by considering the State's contention that defendant acquiesced in the trial court's declaration of a mistrial. In support, the State cites *United States v. Smith*, 621 F.2d 350, 351 (9th Cir. 1980), for the proposition that "[a]n implied consent to a mistrial, like an express consent, removes any double jeopardy bar to retrial." See also *United States v. Gilmore*, 454 F.3d 725, 729 (7th Cir. 2006) ("[A] defendant who fails to object to a mistrial gives his or her implied consent to it."); *People v. Hill*, 353 Ill. App. 3d 961, 966-67 (2004) ("[A]cquiescence constitutes implicit consent to a mistrial and precludes a later double-jeopardy claim." (citing *People v. Camden*, 115 Ill. 2d 369, 378-79 (1987)). While we agree that a defendant who consents to a mistrial, either explicitly or implicitly, generally may not assert that double jeopardy bars her subsequent retrial, that is not what happened here.

¶ 20    In this case, defendant never had an opportunity to object to the State's request for a mistrial. Instead, as soon as the State requested the mistrial—immediately following the trial court's "I can't think of anything more prejudicial" remark—the court asked defense counsel, "what do you suggest I do to remedy this?" Defense counsel responded to the court's question, essentially arguing against the request for a mistrial, by stating that the jury would understand he was referring to Edward's state of mind rather than making a statement of law. This argument shows defendant neither explicitly nor implicitly agreed to the mistrial. The

court interjected that it disagreed and immediately took a five minute recess. Following the recess, the court granted the mistrial without seeking further comment from either party. It then brought the jury back to the room and discharged it. Based on the speed in which the below proceedings occurred, we find that defendant did not have an opportunity to object to the State's request for mistrial. Moreover, the State acknowledges any objection by defendant would likely have been futile because it was the trial court that *sua sponte* found defense counsel's argument to be prejudicial. Accordingly, we find defendant did not acquiesce to the mistrial.

¶ 21    We also reject the State's assertion that defendant's "failure to request a hearing on the day following the declaration of mistrial" and her "failure to file a motion to dismiss the new trial until *** three weeks after the first jury had been discharged" precludes her claim of double jeopardy because her actions somehow "assured that the original jury could not reasonably have been reconstituted to continue defendant's trial after a very brief delay." The State cites no authority, nor did our research reveal any authority, which stands for the proposition that a party can or should request a hearing the day after a mistrial is declared in hopes of reviving an already dismissed jury and continuing on with the trial as if nothing happened.

¶ 22                                    B. Double Jeopardy

¶ 23    Having found that defendant did not acquiesce in the trial court's declaration of a mistrial, we now consider whether double jeopardy bars her retrial for the same offense.

¶ 24    The fifth amendment to the United States Constitution provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const., amend. V. The Illinois Constitution likewise provides that "[n]o person shall be compelled in a criminal case to give evidence against himself nor be twice put in jeopardy for the same offense." Ill. Const. 1970, art. I, § 10; see also 720 ILCS 5/3-4(a)(3) (West 2016) (barring the State from prosecuting a defendant for the same offense if the former prosecution "was terminated improperly after the jury was impaneled and sworn").

¶ 25    The constitutional protection against double jeopardy attaches once the jury is impaneled and sworn. *People v. Bellmyer*, 199 Ill. 2d 529, 538 (2002). This is so because a defendant is entitled to have his or her trial completed before a particular tribunal. *Arizona v. Washington*, 434 U.S. 497, 503 (1978). A second trial "increases the financial and emotional burden on the accused, prolongs the period in which he [or she] is stigmatized by an unresolved accusation of wrongdoing, and may even enhance the risk that an innocent defendant may be convicted." *Id.* at 503-04. As such, the State is generally entitled to only one opportunity to prosecute a defendant. *Id.* at 505. Where a trial court declares a mistrial without the defendant's consent, it deprives the defendant of his " 'valued right' " to have a particular tribunal decide her fate. *United States v. Jorn*, 400 U.S. 470, 484 (1971) (plurality opinion). Thus, when a trial court declares a mistrial without the defendant's consent, a second trial is prohibited unless the State demonstrates a manifest necessity for the mistrial. *Washington*, 434 U.S. at 505.

¶ 26    "[I]n determining whether manifest necessity exists [for a mistrial], the trial court must balance the defendant's interest in having the trial completed in a single proceeding, reserving the possibility of obtaining an acquittal before that 'particular tribunal,' against the strength of the justification for declaring a mistrial rather than attempting to continue the trial

- 6 -

to a verdict." *People v. Street*, 316 Ill. App. 3d 205, 211 (2000) (citing 5 Wayne R. LaFave, Jerold H. Israel, & Nancy J. King, Criminal Procedure § 25.2(c), at 654 (2d ed. 1999)). "The circumstances must be ' "very extraordinary and striking" '; the necessity [for a mistrial] must be 'imperious.' " *People v. Largent*, 337 Ill. App. 3d 835, 840-41 (2003) (quoting *Downum v. United States*, 372 U.S. 734, 736 (1963), quoting *United States v. Coolidge*, 25 F. Cas. 622, 623 (D. Mass. 1815) (No. 14,858)).

¶ 27    A number of factors may be considered in determining whether a "manifest necessity" warranted a mistrial, including:

> "(1) whether the difficulty was the product of the actions of the prosecutor, defense counsel, or trial judge, or was events over which the participants lacked control; (2) whether the difficulty could have been intentionally created or manipulated by the prosecution to strengthen its case; (3) whether the difficulty, prejudice, or other legal complication might have been 'cured' by another alternative that would have preserved the trial's fairness; (4) whether the trial judge actually considered the alternatives to a mistrial; (5) whether a subsequent conviction would be subject to reversal on appeal; (6) whether the trial judge acted in the heat of the trial confrontation; (7) whether the trial judge's decision rested on an evaluation of the demeanor of the participants, the 'atmosphere' of the trial, or any other factors that similarly are not amenable to strict appellate review; (8) whether the trial judge granted the mistrial solely for the purpose of protecting the defendant against possible prejudice; (9) whether the evidence the State presented, prior to the mistrial, suggested a weakness in its case (*e.g.*, a witness failed to testify as anticipated); (10) whether the jurors had heard enough of the case to formulate some tentative opinions; (11) whether the case had proceeded so far as to give the prosecution a substantial preview of the defense's tactics and evidence; and (12) whether the composition of the jury was unusual." *Street*, 316 Ill. App. 3d at 211-12.

¶ 28    On review, we have an obligation to ensure that the trial judge exercised " 'sound discretion' " in declaring a mistrial. *Washington*, 434 U.S. at 514. It is of the utmost importance that a trial court carefully considers all reasonable alternatives prior to declaring a mistrial. *People v. Bagley*, 338 Ill. App. 3d 978, 982 (2003); *Brady v. Samaha*, 667 F.2d 224, 229 (1st Cir. 1981). "Whether the trial judge gave counsel an opportunity to be heard regarding a mistrial is of major importance, as is 'the amount of time devoted to the mistrial decision.' " *People v. Dahlberg*, 355 Ill. App. 3d 308, 315 (2005) (quoting *Brady*, 667 F.2d at 229). "A hasty decision, reflected by a rapid sequence of events culminating in a declaration of a mistrial, tends to indicate insufficient concern for the defendant's constitutional rights." *Id.*

¶ 29    As indicated, in this case the trial court *sua sponte* removed the jury from the room and questioned defense counsel regarding his closing argument—an argument to which the State did not object. While the State ultimately requested a mistrial, it did so only after the court announced that it could not "think of anything more prejudicial" than counsel's statement. Although defense counsel attempted to explain why—in a case where the defense's theory was that Edward made up the story as leverage in his pending divorce and custody battle—he felt the jury would understand his statement referred only to Edward's state of mind. The court, however, disagreed and immediately recessed without allowing counsel further comment. A mere five minutes later, the court returned and announced, "I've thought about

this and there are only two other things I could do." The court then proceeded to reject each remedy it thought of during its five minute recess and immediately declared a mistrial without seeking further input from defense counsel or the State.

¶ 30    The trial court's decision to grant the mistrial in this case after the jury heard all the evidence was clearly a hasty decision. We agree with the trial judge that defendant's argument was improper. However, based on the totality of the evidence presented in this case, the jury was well aware that the parties were divorcing, that Edward was seeking custody of the children, and that DCFS was involved in some manner. In fact, defense counsel's theory of the case was that Edward fabricated the incident to give him an advantage in the dissolution and custody proceedings. Thus, we find that defense counsel's closing statement in this case did not justify the trial court's declaration of a mistrial. Because the State failed to demonstrate a manifest necessity for the mistrial, we reverse the trial court's denial of defendant's motion to dismiss the subsequent criminal complaint on double jeopardy grounds.

¶ 31                                            CONCLUSION

¶ 32    For the foregoing reasons, we reverse the judgment of the circuit court of Will County.

¶ 33    Reversed.