2021 IL App (2d) 190529-U
No. 2-19-0529
Order filed February 8, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Boone County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 15-CF-218 |
| | ) | |
| BRIAN E. CHRISMAN, | ) | Honorable |
| | ) | C. Robert Tobin III, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE BRIDGES delivered the judgment of the court.
Justices Hudson and Brennan concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The invited error doctrine applied to defendant's arguments that trial court erred in not declaring a mistrial and in replacing a particular juror with an alternate. Further, there was sufficient evidence to prove defendant guilty beyond a reasonable doubt of all ten counts of predatory criminal sexual assault of a child. Therefore, we affirm.

¶ 2    Following a jury trial, defendant, Brian E. Chrisman, was convicted of 10 counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2014)) and received consecutive sentences of 7½ years for each count. On appeal, defendant argues that the trial court

erred in refusing to declare a mistrial and in replacing a particular juror with an alternate. Defendant also argues that he was not proven guilty beyond a reasonable doubt. We affirm.

¶ 3                                I. BACKGROUND

¶ 4        On October 15, 2015, a grand jury indicted defendant on 10 counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2014)). As amended, the charges alleged that between November 20, 2007, and November 19, 2014, defendant, who was 17 years of age or older, committed an act of sexual penetration with K.C., who was under 13 years of age. Counts 1 through 5 alleged that he placed his penis in her sex organ, and counts 6 through 10 alleged that he placed his penis in her mouth.

¶ 5        Defendant's jury trial began on April 10, 2016. We summarize K.C.'s testimony. Her birthday was on November 20, 2001, and she was 17 years old. Defendant and Stacey Chrisman adopted her when she was very young. They also had two biological children, N.C. and J.C. K.C.'s room was near the bathroom, her siblings' rooms were upstairs, and her parents' room was in the basement. Things "were good in the beginning" and they treated her fairly, "but then it turned bad." Her parents started imposing punishments including going to her room, maintaining a sitting position against the wall, standing with her hands in the air, having her hair shaved off, and getting "beat." The punishments were progressive, such as she was told to go to her room if she did something wrong, and if she came out of her room, she was told to stand by the wall. K.C. sometimes took food to her room because she was not allowed to have snacks like her siblings, and as punishment she was forced to stay in her room in only her bra and underwear. She always had to ask permission to use the bathroom. She was sometimes allowed to eat dinner at the table but at other times was required to eat in her room. Defendant installed a camera on her bedroom ceiling because he and Stacey wanted to see what she was doing.

¶ 6     When K.C. was about six years old, defendant came into her room while she was sleeping and kissed her. His actions escalated after that, and he started touching her and then putting his penis in her private part. K.C. did not know how old she was when this first happened. Defendant did this multiple times in her bedroom, and he would have her suck his penis before and after the intercourse. Defendant also had intercourse with her multiple times in his bedroom. Sometimes he would be on top of her on the bed, and other times she would have her legs over the side of the bed and he would be standing next to the bed, in front of her. Both positions occurred more than one time. He also had her suck his penis in his bedroom multiple times. He would either ejaculate in her mouth or in the bathroom sink near his room. Defendant would additionally make her watch pornography on his phone or on videocassettes. Defendant once said not to tell anyone what was happening or he would do something to her, which scared K.C. Stacey was not at home when defendant abused K.C., but her siblings were in the house. For a period of time, other foster children also lived in the house, as did a woman named Sam Meidinger.

¶ 7     There was one instance where K.C. and defendant had intercourse in a covered trailer that defendant owned as part of his lawn care business. They had their pants down to their ankles, and defendant sat on a mower and she sat on top of him, with their private parts touching. Once, he made her suck his penis when he was driving a truck, and he did so again another time when they were in a different house that was being painted.

¶ 8     K.C. took medication for ADHD, for trauma, and to stabilize her mood.[1] She had "IEPs" in elementary school and teachers' aids in middle school because she had trouble focusing and

---

[1] The parties stipulated that K.C. had been diagnosed with disruptive mood dysregulation disorder, attention deficit hyperactivity disorder, autism spectrum disorder, generalized anxiety

paying attention. During the seven years that K.C. was abused, she was involved with school counselors and behavioral therapists. K.C. first disclosed the abuse after she had moved out of defendant's house in 2015; she did not remember how old she was when she moved out. However, when she was 13 years old, her new foster mother discovered that K.C. was watching pornography on an iPad, and K.C. told her that she used to watch pornography with defendant. K.C. missed defendant because she still thought that he loved her, and she was doing something that they used to do together. K.C. then revealed the abuse to her new foster mother and subsequently to individuals with the Department of Children and Family Services.

¶ 9    N.C., defendant's daughter, testified as follows. She was currently a college freshman. K.C. constantly needed attention, and it was difficult for their parents to manage her. K.C. would do things like bite her fingers until they bled and rip out her hair. If K.C. did something wrong, punishments included sending her to her room or making her stand in the corner for a couple of minutes. If she did not comply, she would have to stand with her hands in the air for a few minutes. Family members escorted K.C. to the bathroom and the kitchen so that she would not run off and steal things. There was an alarm on K.C.'s door because she would come out in the middle of the night. N.C. was afraid that K.C. would hurt her while she was sleeping because K.C. had violent tendencies; K.C. once stabbed a boy at school in the back with a pencil. Their parents installed a camera in K.C.'s room because they were afraid that she would hurt herself. K.C. was never at home alone with defendant, and N.C. never saw them downstairs, where their parents' room was, by themselves.

_____

disorder, and post-traumatic stress disorder.

¶ 10 J.C., defendant's son, testified as follows. He was 16 years old. Life with K.C. was stressful because she could never be left alone; she would do things like bite her nails until they bled, rip out her hair, and rip up her clothes. She had an alarm on her door because she would otherwise take food from the kitchen and hide it in her room. J.C, N.C., and their mother would escort K.C. to the bathroom and have her leave the door open so that she would not hurt herself with something in the bathroom. J.C. was never worried about his own personal safety. All three kids were mostly in their own rooms when they were not at school. K.C. did not have very much in her room because she destroyed things.

¶ 11 We next summarize the testimony of Stacey Chrisman. K.C. moved in with them in January or February 2006 after having been in foster care. She lived with them at the request of K.C.'s biological mother, who had been Stacey's co-worker. Stacey was a manager for McDonald's from 2001 until early 2010, when she stopped working and was home. K.C. was "difficult" in that she would do things that they specifically asked her not to do. She would break things, steal things, and lie about the things she stole. When K.C first came to live with them, she pushed J.C. off a stool, and he hit his head on the wall. K.C. would scream profanities for no reason, pound on the wall and the floor, and throw things. Stacey was constantly getting calls from the school saying that K.C. had done things like stabbed a child with scissors, cut up her clothes, hit a child, or run out of school during gym class. For punishments, they tried having her sit or stand in timeout, or go to her room. Initial punishments could progress into more serious punishments. They also tried managing her behavior by getting an outdoor trampoline and making deals with her, as a therapist suggested. Once when Stacey was making dinner, K.C. was not listening for hours and kept coming out of her room, so Stacey told her to take off her clothes so that she would not come out of her room. K.C. was involved in counseling that took place at least weekly the entire time that

she lived with them. Stacey never observed any behavior between defendant and K.C. that was sexual in nature.

¶ 12   Sherry Burks, a Department of Children and Family Services (DCFS) child protection specialist, testified as follows. DCFS received a report in May 2015 that K.C. had undergone extreme punishments, such as shaving her head. Burks went to the residence on August 6, 2015. K.C.'s head was not shaved, nor did Burks ever see a picture of her head shaved. K.C.'s room had no carpeting, a bed with just a sheet on it, a dresser with the drawers facing the wall, a window nailed so that it could not be raised up, and an alarm on the door. Everything else in the house was normal, except that there were only four chairs around the dining table. N.C. and J.C. told Burks that K.C. had to stay in her bedroom all day every day and that she had to wear just a bra and underwear one day. N.C. said that K.C. ate in her bedroom. J.C. stated that her punishment was to stand facing the wall with her arms above her head, and that if she looked around, a pillowcase was placed over her head. He said the punishments lasted five or ten minutes, or the whole day. The children were interviewed separately, without other adults present, and there was no mention of any sexual problems. Burks returned to the home on August 15, 2015, to take protective custody of K.C. based on the punishments, but defendant refused and said he would contact an attorney. Burks then called the police.

¶ 13   Samantha Thompson, f/k/a Samantha Meidinger, testified as follows. She had become friends with Stacey when she worked with her at McDonald's 10 or 11 years prior, and she went to Stacey's house "all the time." When Thompson was in her third trimester of pregnancy in 2011, K.C. once kicked her very hard in the stomach and laughed about it. Thompson and her baby daughter moved in with the Chrismans in March 2013 because the baby had special needs and Thompson's husband did not want the child. Thompson moved out of the Chrismans' house in

June or July 2014. Thompson used the bedroom across from J.C. and K.C. One morning, K.C. defecated on her pillow and smeared it because she did not feel like going to the bathroom. K.C. would also take loaves of bread into her bedroom and hide them even though K.C. was constantly making herself peanut butter sandwiches in the kitchen. K.C.'s room was like a normal girl's room in the beginning, but it contained fewer things as time went on because K.C. was constantly breaking things and ripping them apart. She would also hurt herself by engaging in actions like pushing the front and back of her earrings together until her ears bled. Once in 2013, Thompson saw K.C. pushing very hard on the baby. There were alarms on many doors in the house because Stacey had post-traumatic stress disorder (PTSD). Thompson did not recall defendant ever being alone with K.C. Thompson worked three-hour shifts, and Stacey would watch the baby for her during that time.

¶ 14    We next summarize defendant's testimony. He was 54 years old and had been married to Stacey for 20 years. They took in K.C. in 2007,when she was five or six years old, because it was an opportunity to help someone in need. Defendant was working at a flooring company. He would be up at about 4 a.m. and come home from work at about 3 p.m. Stacey worked from 10 a.m. to 7 p.m. K.C. had behavioral issues and violent tendencies, so she went to an elementary school for children with such issues. Wisconsin child protection services came to the house four to six times per month for mandatory visits with K.C.'s biological mother and to check on the house. The visits stopped in 2009 or 2010, when the Chrismans adopted K.C.

¶ 15    Defendant had a work-related injury in 2007, and he began to stay home and take care of the children. He was never home alone with K.C. because the other children were also present, and he was never alone with her in his bedroom. There was a concern about K.C. going to the bathroom by herself because she had a tendency to put things in her mouth, and they were afraid

she would ingest bathroom cleaners or otherwise hurt herself in the bathroom. K.C. constantly wanted food, to the extent that if there were three loaves of bread on the counter, she wanted all three; she wanted to take all of the food in the kitchen and hide it in her room. Therefore, they did also not allow her to be in the kitchen alone. K.C. had monthly doctor visits in 2007 and 2008 to monitor her medication, and there was never any indication that she was not being fed properly. They had a high kitchen table with eight tall chairs, and because all of the chairs did not fit around the table, they usually kept them against the back wall. When Thompson came to live with the family, she took N.C.'s room, and they set up a bed for N.C. in their room. They did not have internet in the house and defendant did not own any pornography, nor had he ever shown K.C. pornography on his phone.

¶ 16    Defendant and Stacey started a landscaping business in summer 2008. Defendant worked from sunrise to sunset, and Stacey took care of the children. In the winter months, he plowed snow. Defendant was still never alone in the house with K.C. He bought a camera system to monitor all of his landscaping equipment, and they had several extra cameras. They decided to install them inside the house to help with Stacey's PTSD. They also installed one in K.C.'s room to monitor her because their bedroom was on a lower level. K.C. used to have everything a typical child would have in her room, but they had to progressively remove things because K.C. would break them. They had nailed the bottom of the window shut for safety purposes because K.C. once climbed out the window.

¶ 17    Defendant never kissed K.C. other than a normal goodnight kiss that he gave to all of the kids. Defendant never removed K.C.'s clothes, never forced her to remove her clothes and stand naked in the closet, and never made her sleep naked. He also never put his penis in her mouth, had

his private part touch her private part, had intercourse with her, or had any sexual relations with her. Due to a health issue, defendant was not able to have an erection beginning in 2008.

¶ 18   Melissa Master provided the following testimony as a rebuttal witness. She was 23 years old and lived with the Chrismans as a foster family in 2008, when she was about 12 years old. Master's two younger sisters also lived with the family. There were times when defendant was in charge of watching all of the kids. Master remembered more than one instance when defendant was yelling and forcefully removed K.C.'s clothes and made her stand in the corner of her closet as punishment. Another time, he made K.C. go to sleep completely naked. Master did not believe that Stacey was at home on these occasions. Master's two younger sisters slept in the same room as K.C.

¶ 19   The jury deliberated for several hours after closing arguments. The next morning, the trial court announced that juror number 10 had told the bailiff late the prior day that he wanted to talk to the trial court because there was an issue that he wanted to raise about another juror. The trial court had advised the attorneys that they would meet with the juror before the jury resumed deliberations. Juror 10 was brought in and stated that after a night's rest, he was wondering if the issue was that it was "heated" in the jury room yesterday and if he was "misreading personalities." The trial court asked if he could continue to deliberate, and the juror replied in the affirmative.

¶ 20   In the afternoon, the trial court stated that "[a]pparently there was an altercation" or "it's gotten loud between two jurors," to the point that there was pounding on the door and someone saying "let's take this outside." The bailiff then stepped between the jurors. The trial court stated that one juror was on his way to the chambers. The State stated that they could consider excusing both of the jurors and using the alternates. Defense counsel stated that whatever happened may have already prejudiced the jury pool.

¶ 21    Juror number 6 entered the chambers, and the trial court stated that it "sound[ed] like things may have gotten a bit heated down there." Juror 6 responded, "Really heated. I'm still shaking." He stated that the other juror (juror number 2) said that he and a family member had experience with this type of case, and that juror 2 had done research on the statistics of such cases. Juror 2 kept making statements about "letting a rapist go." Juror 2 asked juror 6 if he would be able to sleep, and that if something happened after the case ended, he would be sure to call juror 6 and tell him about it. Juror 6 continued:

> "Today he made a statement about that I hope you're able to sleep at night if you vote a certain way. Yesterday I made a comment and it didn't quite come out the way I wanted it to, and he just jumped up, threw his hands up in the air, marched off to the bathroom. On the way there, he said, 'That's the most asinine statement I ever heard.' Yesterday towards the end of the day, I asked him to quit using the F word because he was doing a lot of that. So that's about it."

The trial court asked the parties if they had any questions of the juror, and they responded in the negative.

¶ 22    The trial court stated that it was inclined to find that the jury was hung and declare a mistrial. Defense counsel agreed, stating that a juror had apparently been intimidating and discussing outside sources. The State again suggested getting rid of both jurors and replacing them with the alternates, saying that each of them seemed to have a "faction" and that kicking out only one might signal approval of the other side. Defense counsel again raised the issue of the entire jury pool being tainted.

¶ 23    Juror 2 was brought into chambers and stated that "although [he] clearly [was] not getting

along with a member of this jury and [did not] have very much respect for him, [he had] to see this through" because the jury had spent so much time working on the case. He admitted reading a couple of psychology articles online about basic sexual assault statistics. Juror 2 said that he would make himself get along with juror 6.

¶ 24    After juror 2 left the chambers, defense counsel stated that they were talking to only three jurors and that he was concerned about the rest of the jury pool. The trial court stated that it did not disagree and that if they were going to continue by excluding one or two of the jurors, they would have to see if the remaining jurors could continue to deliberate based on everything that had happened. The trial court asked juror 10 to return. He stated that the "other person [was] very passionate about his side" and that there might be a need for one, if not both, alternates in the case. He said that juror 2 had read some statistics about abuses that are reported. Juror 10 said that it "was just information that [juror 2] wanted to put out there," and that it did not become a part of deliberations. Juror 10 thought that everyone on the jury was "pretty much on their stance as to what their votes" were and that they would not be able to negotiate further. When asked by the trial court if he thought that the jury could restart deliberations with the two alternates and come to a resolution, Juror 10 responded in the affirmative. He said that it would "neutraliz[e] the acidity of the situation."

¶ 25    After juror 10 left the room, the trial court stated, "Let's hear what everybody says." The State took the position that the statistics juror 2 recited were not something the jury focused on or discussed. It stated that putting in the alternates would get rid of the toxicity in the room, as juror 10 had stated. Defense counsel responded that it seemed like the jury was deadlocked and that he did not believe that there was sufficient evidence to get rid of jurors 2 and 6. He stated, "I don't think that it's proper to throw these two out and bring in two new jurors just because they have

opposite views of what's going on." The trial court stated that it was not sure that they had opposite views. It stated that it did not believe that juror 2's language was a threat but that juror 6 was shaking and having a difficult time based on what he perceived to be threats. Defense counsel stated that he did not disagree that juror 6 had "physical manifestations of what's going on." The trial court stated that juror 6 would need to be dismissed not because of his opinion, but rather based on him saying that he could not continue and how he looked when he said this.[2] That is, he was both physically and mentally unable to serve. The trial court's only concern about juror 2 was that his outside research was contrary to instructions. The trial court stated that, therefore, both jurors 6 and 2 would need to be removed, and the question was whether the trial could proceed with the remaining 10 jurors plus the two alternates. It stated that it would call up the 10 remaining jurors and ascertain if they could disregard the research and start from scratch with the two alternates. Otherwise, the trial court would declare a mistrial. The trial court asked, "Any thoughts? I mean, other than what you stated." Defense counsel replied, "No. I just think finding out from the rest of the jurors I think is probably real important." He then participated in a discussion about how the remaining jurors should be questioned.

¶ 26    The following dialogue subsequently took place:

> "THE COURT: All right. So I'm going to discharge those two after we've got the jurors addressed and then I'll bring each one maybe back up here individually and just thank them for their service and we'll figure out the escort, but we'll deal with all of that out there in—I guess it's in open court. Actually, it can't be open court. They're a jury deliberating. We'll clear the—we'll at least clear the courtroom.

---

[2] The record does not reflect that juror 6 directly made such a statement.

BAILIFF FAST: Okay. I'll do that now.

THE COURT: Get people out of here.

[DEFENSE COUNSEL]: Just for the record, Judge, I mean, obviously—*[Juror 6], are we in agreement he's going because of his physical inability?*

THE COURT: His mental as manifested by his physical. He started out—again, just to make a little record. He seems like he's got pretty good health, but he does use some sort of—he's got some sort of a limp or something to his gate [*sic*], but as he came up here this time, he was physically shaking and appeared distraught and indicated, as far as I was concerned, that he could—he could no longer participate in that because he felt that he was being threatened, but based upon the statements made, I don't really think those were threats as much as they were just communications that he didn't like.

[ASSISTANT STATE'S ATTORNEY]: [Juror 6] is the one who knocked on the door to request the bailiff; correct?

THE COURT: Yeah.

BAILIFF FAST: Yes. He opened the door and asked for a bailiff.

THE COURT: I think from his standpoint, he's unable to serve both physically and mentally. He's not willing to do what's required of a juror is to keep those communications going.

[DEFENSE COUNSEL]: *Okay.*

THE COURT: If they were actual threats, then I'd leave him in and remove the person making the threat. I don't see anything that—I don't see the statements that were being made by [juror 2] as threats to the point of removal. I do—my issue with [juror 2] is the outside research. That you can't do.

[DEFENSE COUNSEL]: *Right.*

THE COURT: So one removal is his inability and sort of his unwillingness to continue to serve from [juror 6]. The other one [juror 2], he did exactly the opposite of what I asked. He went out and did his own research. So let's leave those two I guess down there with a sitter and bring the other two up—the other ten up into the jury box and I'll address them, and in the meantime, call in our alternates and get them in." (Emphases added.)

¶ 27    The trial court called in the 10 jurors and asked if there was anyone who would not be able to disregard one of the juror's outside research. No juror raised his or her hand. The trial court stated that the two alternates would join the group and that the 10 jurors would have to go back to the stage of having an open mind and consider the opinions of the alternates.

¶ 28    After the alternates joined, the jury returned a verdict in about 2 hours, finding defendant guilty of all counts.

¶ 29    On May 6, 2019, defendant filed a motion for a new trial. He raised the arguments presented on appeal, among others. He also filed a motion for judgment *n.o.v.* arguing that the evidence was insufficient to prove him guilty beyond a reasonable doubt. The trial court denied the motions on May 29, 2019. Regarding the removal of juror 6, the trial court stated that he was banging on the jury door to get out of the room, he was interpreting the statements of juror 2 to be threatening even though they were not, and he was shaking, which was a physical manifestation of the distress that he was in. The trial court stated that to send juror 6 back to the jury room may have put his physical and mental health in jeopardy, that he would not have been able to fulfill his duties, and that defendant never argued that he could continue to serve as a juror. Regarding juror 2, the trial court stated that it instructed the jury from the beginning not to do outside research. It

stated that although this occurred, it did not become a point of discussion during deliberations, the jurors were advised that they could not consider the information, and the jurors were specifically asked if any one of them could not disregard the information. The trial court further stated that the alternate jurors were not exposed to outside prejudicial influences, any concern about the original jurors forming opinions about the case was mitigated by the instruction to start over with an open mind, and the reconstituted jury was instructed to begin deliberations anew. The reconstituted jury took a little less than two hours to reach a verdict, and since there was not a lot of evidence to go over, the almost two-hour deliberations indicated that they started from scratch.

¶ 30    The trial court sentenced defendant to 7½ years on each count, to be served consecutively. Defendant timely appealed.

¶ 31                                    II. ANALYSIS

¶ 32                                    A. Mistrial

¶ 33    Defendant first argues that the trial court erred in not declaring a mistrial upon learning of juror misconduct, namely juror 2 conducting outside research and sharing this information with the jury. Defendant cites three cases in support, all involving a party's attempt to impeach the jury's verdict due to improper conduct during deliberations: *People v. Holmes*, 69 Ill. 2d 507 (1978); *Heaver v. Ward*, 68 Ill. App. 3d 236 (1979); and *Haight v. Aldridge Electric Co.*, 215 Ill. App. 3d 353 (1991). In *Holmes*, several jurors went to a shoe store and inspected shoe heels after hearing a police officer's testimony that the assailant had left a shoe print in the snow that matched the heel of the defendant's left shoe. *Holmes*, 69 Ill. 2d at 509-10. In *Heaver*, the jury foreman visited the accident scene and drew a diagram of it for the jury, and further brought in a book about driving rules. *Heaver*, 68 Ill. App. 3d at 239. In *Haight*, a juror looked at an almanac to determine the time of sunset on the day of the car accident at issue and shared the information with the jury.

*Haight*, 215 Ill. App. 3d at 368. All three cases held that the introduction of the extraneous information constituted prejudicial and thus reversible error. *Holmes*, 69 Ill. 2d at 519; *Heaver*, 68 Ill. App. 3d at 241-42; *Haight*, 215 Ill. App. 3d at 370-71.

¶ 34    Defendant emphasizes certain passages within these cases. He points out that in *Holmes*, the court quoted the statement in *People v. Rivers*, 410 Ill. 410, 416 (1951), that " '[t]he defendant in any criminal proceeding has an inherent and constitutional right that all proceedings against him shall be open and notorious, and in his presence, and any inquiry or any acquisition of information or evidence outside of open court and outside of the presence of the defendant is prejudicial error.' " *Holmes*, 69 Ill. 2d at (quoting *Rivers*, 410 Ill. at 416). The *Holmes* court continued:

> "We do not interpret *Rivers* to mean, nor do we now hold, that every instance in which extraneous or unauthorized information reaches the jury results in error so prejudicial as to require reversal. Here the extraneous information improperly brought to the jury's attention was in the nature of evidence crucial to the question of defendant's identification with which he had neither been confronted at trial nor had the opportunity to refute," which "resulted in error so prejudicial that the judgment must be reversed and the cause remanded." *Id.* at 519.

In *Heaver*, the court stated, "It is enough that the unauthorized evidence directly relates to issues in the case and may have improperly influenced the verdict." *Heaver*, 68 Ill. App. 3d at 241.

¶ 35    Defendant argues that it was undisputed that juror 2 brought extraneous information to the jury room regarding statistics on how many sexual assaults go unreported. Defendant asserts that in light of *Holmes* and as applied in *Heaver* and *Haight*, this was prejudicial error. He further argues that the information pertained directly to K.C.'s credibility, which was the central issue in the case. In particular, he emphasizes that he denied the abuse and that defense counsel tried to

cast doubt on K.C.'s credibility through showing that during the seven years that the abuse allegedly took place, K.C. had ample opportunities to disclose the abuse to doctors, counselors, and people within the school system, and that it was not until she was caught watching pornography that she made the allegations against defendant.

¶ 36    The State maintains that defendant forfeited this argument by acquiescing in the trial court's decision to question the remaining ten jurors, and in the substance of that questioning. The State argues that defendant's claim also fails on the merits because the trial courts in his cited cases did not become aware of the extraneous information until after the juries rendered their verdicts, whereas here the trial court became aware of juror 2's research before the jury's decision. The State maintains that the trial court, with each party's input, was therefore able to gauge the nature of the extraneous information and its impact on the jury's deliberations. The State asserts that the information consisted of generalized statistics and was not directly related to any witness or evidence in the case. See *People v. Wurster*, 83 Ill. App. 3d 399, 410 (1980) (reversal was unwarranted where "the extraneous information considered by the jury did not involve evidence related to guilt but a strictly collateral matter"). The State points out that the juror who conducted the research was removed, and that each of the ten remaining jurors agreed that they could disregard the research. The State cites *People v. Walker*, 386 Ill. App. 3d 1025, 1029 (2008), where the court stated that the "jurors' oral assurances that they could disregard the event and decide the case solely on the evidence are to be given important but not conclusive consideration." The State argues that, therefore, even if defendant properly requested a mistrial, the trial court would not have abused its discretion in denying the motion.

¶ 37    Defendant responds that he did not forfeit his argument, because he raised multiple objections during the proceedings, and he raised the issue again in his posttrial motion. He alternatively argues that we should review the issue for plain error.

¶ 38    We conclude that the doctrine of invited error, rather than forfeiture, applies. "Under the invited-error doctrine, a defendant cannot complain of error that he or she induced the trial court to make, or to which he or she consented." *People v. Montes*, 2020 IL App (2nd) 180565, ¶ 45. Invited error further creates an estoppel that precludes plain-error analysis. *People v. Holloway*, 2019 IL App (2d) 170551, ¶ 44.

¶ 39    It is true that up until right after juror 6 was questioned, defense counsel repeatedly raised the issue of the jury pool being tainted and a mistrial being warranted. The trial court agreed with counsel at that point in time as well. See *supra* ¶ 22. After juror 2 was questioned, defense counsel stated that they had heard from only three jurors and that he was concerned about the rest of the jury pool. See *supra* ¶ 24. The trial court stated that it did not disagree and that if they were going to exclude one or two jurors, they would have to see if the rest of the jury could continue to deliberate. *Id.* It asked juror 10 to return, and after he left, the trial court stated, "Let's hear what everybody says." *Supra* ¶ 25. At this point, defense counsel did not say that the trial court should declare a mistrial, but rather stated, "I don't think that it's proper to throw these two out and bring in two new jurors just because they have opposite views of what's going on." *Id.* Defense counsel's statement shows that he switched his stance from advocating for a mistrial to stating that both jurors should remain. The trial court then discussed that it was concerned about juror 6's physical and mental inability to serve, and juror 2's outside research. *Id.* It stated that it was going to discharge them and asked "Any thoughts? I mean, other than what you stated." Defense counsel again did not assert that there should be a mistrial but instead stated, "No. I just think finding out

from the rest of the jurors I think is probably real important." Counsel then participated in a discussion about how the remaining jurors should be questioned. *Id.*

¶ 40    Defense counsel subsequently repeated his consent by stating, "Are we in agreement he's [juror 6] going because of his physical inability?" *Supra* ¶ 26. When the trial court stated that it was because of his both his physical and mental inability to serve, defense counsel did not object but rather replied, "Okay." *Id.* The trial court then stated that it was removing juror 2 because of his improper outside research, to which defense counsel responded, "Right," thereby again indicating consent. Accordingly, the record shows that although defense counsel initially advocated for a mistrial, he then abandoned that position and argued that both jurors 2 and 6 should remain before subsequently agreeing with the trial court that there was reason to remove both of them. The doctrine of invited error therefore applies to defendant's argument that the trial court erred in not declaring a mistrial.

¶ 41    Even absent invited error, defendant's argument fails on the merits. A defendant's right to a fair trial includes the right to an impartial jury free from any outside influences. *People v. Holliday*, 2020 IL App (5th) 160547, ¶ 37. "A mistrial is necessary when it appears that the jury was so influenced and prejudiced that it could not have been fair and impartial and that the damaging effect could not be cured by admonitions and instructions." *Id.* (quoting *People v. Clark*, 231 Ill. App. 3d 571, 574-75 (1992)); see also *People v. Bishop*, 218 Ill. 2d 232, 251 (2006) ("a mistrial should be granted where an error of such gravity has occurred that it has infected the fundamental fairness of the trial, such that continuation of the proceeding would defeat the ends of justice"). "It is of the utmost importance that a trial court carefully considers all reasonable alternatives prior to declaring a mistrial." *People v. Shoevlin*, 2019 IL App (3d) 170258, ¶ 28. It is within the trial court's discretion to determine whether the jurors have been influenced and

prejudiced to the degree that they cannot or would not be fair and impartial. *Holliday*, 2020 IL App (5th) 160547, ¶ 37. A trial court abuses its discretion only where its decision is arbitrary, fanciful, or unreasonable to the extent that no reasonable person would agree with it. *People v. King*, 2020 IL 123926, ¶ 35.

¶ 42    Based on the record, the trial court did not abuse its discretion in denying defendant's request for a mistrial. The trial court first learned of a potential issue when juror 10 told the bailiff toward the end of the day that he wanted to discuss an issue about a juror with the trial court. The trial court had the juror come in the next morning, but the juror said that he may have been "misreading personalities" and that he could continue to deliberate. However, that afternoon, there was a conflict between jurors 6 and 2 to the extent that juror 6 was pounding on the door, and a bailiff stepped between the jurors. When juror 6 came into the chambers, he related that juror 2 said he had done research on sexual assault statistics. Juror 2 subsequently confirmed this information. The trial court then decided to bring back juror 10 to ask about the outside information. Juror 10 said that the statistics were "just information that [juror 2] wanted to put out there," and that it did not become a part of deliberations. Juror 10 stated that everyone was "pretty much on their stance as to what their votes" were and that they would not be able to negotiate further, but that they would be able to restart deliberations with the two alternates and come to a resolution. Subsequently, the trial court stated that juror 2 would have to be removed because his outside research was contrary to instructions,[3] and that it would question the 10 remaining jurors as to whether they would be able to disregard the research and begin anew with alternate jurors. It

---

[3] We discuss the trial court's removal of juror 6 in the context of defendant's second argument.

stated that if a juror could not, it would declare a mistrial. Upon questioning if there was anyone who would not be able to disregard the outside research, no juror raised his or her hand. The trial court then had the two alternates join the jury.

¶ 43    Accordingly, the record reveals that the trial court immediately addressed the issue of the extraneous information by inquiring about the information from the juror who shared it, and questioning two other jurors. Juror 10 stated that the statistics did not become a part of deliberations, and the ten remaining jurors agreed that they would be able to disregard the information. Given the lack of importance the jury gave the statistics, it was not so influenced and prejudiced that any potential negative effects could not be cured by admonitions and instructions. See *Holliday*, 2020 IL App (5th) 160547, ¶ 37. The trial court therefore acted in its discretion in dismissing juror 2 and having the alternates join the jury, instead of declaring a mistrial. See also *People v. Middleton*, 2018 IL App (1st) 152040, ¶ 29 (a "mistrial in a criminal prosecution should only be granted with the greatest caution, under urgent circumstances and for very plain and obvious causes.").

¶ 44    This case is distinguishable from those cited by defendant, as they all involved a party's attempt to impeach a jury's verdict, whereas here the exposure to extraneous information came to light during the deliberations. Additionally, even *Holmes* stated that if a jury is exposed to such information, it does not require automatic reversal, but rather the nature of the evidence must be examined. *Holmes*, 69 Ill. 2d at 519.

¶ 45                              B. Dismissal of Juror 6

¶ 46    Defendant next argues that the removal of juror 6 deprived him of his right to a unanimous verdict rendered by an impartial jury.

¶ 47 "[P]ostsubmission replacement of a juror is permissible under limited circumstances, and the decision whether to proceed in that manner is within the discretion of the trial court." *People v. Roberts*, 214 Ill. 2d 106, 109 (2005). The primary consideration in determining whether the trial court abused its discretion is the potential prejudice to the defendant as a result of the replacement. *Id.* at 121. In evaluating prejudice, we consider the totality of the circumstances, including:

> "(1) whether the alternate juror and the remaining original jurors were exposed to outside prejudicial influences about the case; (2) whether the original jurors had formed opinions about the case in the absence of the alternate juror; (3) whether the reconstituted jury was instructed to begin deliberations anew; (4) whether there is any indication that the jury failed to follow the court's instructions; and (5) the length of deliberations both before and after the substitution." *Id.* at 124.

¶ 48 Defendant argues that applying these factors to the instant case shows that he was prejudiced. For the first factor, he argues that the original jurors were exposed to outside prejudicial influences in the form of juror 2's statistical research. He argues that the trial court also failed to inquire whether the alternate jurors had been exposed to any improper influences when they were out in the community. For the second factor, he argues that the transcribed discussions in chambers show that the jurors had formed opinions about the case. Specifically, juror 10 stated that everyone was "pretty much on their stance as to what their votes are." Regarding the third factor, defendant acknowledges that the trial court admonished the jury to begin deliberations anew. For the last two factors, defendant argues that the original jurors debated for about five hours, and the reconstituted jury returned a verdict after only about two hours.

¶ 49 Defendant additionally argues that there is a reasonable possibility that the impetus for the trial court's dismissal of juror 6 was the juror's views about the case. Defendant argues that juror

6 left no doubt as to his view after he stated that juror 2 kept making statements about "letting a rapist go" and asking juror 6 if he would be able to sleep if he voted a certain way. Defendant analogizes this case to *People v. Gallano*, 354 Ill. App. 3d 941 (2004), where the court stated that "where the record shows any reasonable possibility that the impetus for a juror's dismissal during deliberations stems from his views regarding the sufficiency of the evidence, the dismissal of that juror constitutes error." *Id.* at 954. In that case, a juror sent a note to the trial court stating that he was the lone holdout and would not change his mind because he believed that there was a reasonable doubt about the defendant's guilt. *Id.* at 954. Only then did the State research the juror's criminal record, which revealed that he had lied about his background during *voir dire*, and the trial court replaced the juror with an alternate. *Id.* at 954-55. Applying *de novo* review, the reviewing court concluded that there was more than a reasonable probability that the impetus for the juror's dismissal stemmed from his views about the evidence's sufficiency. *Id.* at 954. The court stated that when the juror's status as a holdout was revealed, the trial court could have either sent the jury back to continue deliberating or declared a mistrial. *Id.* Once it became aware of the juror's untruthfulness and determined that he should be discharged for cause, its only option was to declare a mistrial. *Id.*; see also *People v. Nelson*, 235 Ill. 2d 386, 449 (2009).

¶ 50    Defendant points out that the trial court here stated that it did not think that juror 6 could be "part of the jury anymore by his own request and statements." Further, during the hearing on the motion for a new trial, the trial court stated:

> "[F]irst of all, he's banging on the jury door to get out of there. Secondly, he was interpreting statements made by one of the jurors to be threatening when they were not.
>
> And, three, he was shaking, a physical manifestation of the distress he was in. If the Court were to send him back into that room, the Court may have been putting his mental

and physical health in jeopardy. The juror would not have been able to fulfill his duties.

Further, the defendant never argued that the juror could have continued to serve as a juror." Defendant argues that, contrary to the trial court's statements, the record does not indicate that juror 6 ever requested to be relieved of duty. He maintains that the record also does not support the trial court's view that returning juror 6 to the juror room would put his mental health in jeopardy, because juror 2 had already been dismissed and was no longer a threat. Defendant argues that there was therefore a reasonable possibility that the impetus for juror 6's dismissal was his views concerning the merits of the State's case.

¶ 51 The State argues the doctrine of invited error applies. The State also argues that defendant has failed to show any prejudice from the trial court's decision to install the two alternate jurors. It maintains that the trial court was able to ascertain that the outside research had a negligible impact on deliberations. The State argues that the alternates were never exposed to the statistics and that the trial court further received affirmations from the 10 remaining jurors that they could disregard the information. The State asserts that although it is clear that the jury formed some opinions, it is unclear how entrenched those opinions were, as juror 10 stated that he thought that the remaining jury members could work with the alternates to get a resolution. It notes that the trial court instructed the reconstituted jury to begin deliberations anew, and it argues that there is no evidence that the jury did not heed this instruction. According to the State, the fact that the reconstituted jury deliberated for about two hours in a case that did not have much evidence to analyze shows that it did indeed start over. The State reasons that the jury may have previously deliberated for five hours because the dispute between jurors 2 and 6 side-railed part of those deliberations. The State argues that the totality of the circumstances demonstrates that defendant was not prejudiced by the post-submission replacement of the two jurors.

¶ 52    The State also argues that there is not a reasonable probability that the impetus behind juror 6's dismissal was his views regarding the case's merits. The State contends that, unlike *Gallano*, the trial court was careful to tell the jurors called to chambers not to disclose the substance of the deliberations or jurors' votes, and juror 6 never disclosed his position on the case. The State argues that to the extent that his view was disclosed, the trial court could properly ignore the statements and focus on the altercation being investigated. See *United States v. Vartanian*, 476 F.3d 1095, 1098-99 (9th Cir. 2007) (trial court properly ignored unsolicited statement about juror's views, and its impetus for dismissed her was her misconduct outside of the jury room). The State argues that the impetus for juror 6's dismissal was his pounding on the door after an altercation with juror 2, his shaking and physical manifestations during questioning, and the trial court's belief that the juror was not physically and mentally able to continue.

¶ 53    For the reasons discussed above, we agree with the State that the doctrine of invited error applies to defendant's argument. That is, defense counsel consented to both jurors 6 and 2 being replaced with alternates, as opposed to asserting that juror 6 should remain on the jury. Defense counsel explicitly stated, "Are we in agreement he's [juror 6] going because of his physical inability?" Defense counsel's words indicate that, rather than objecting to juror 6's dismissal, he was agreeing that juror 6 should be dismissed because of his inability to serve. The trial court then stated that juror 6 was "unable to serve both physically and mentally" and "not willing to do what's required of a juror is to keep those communications going," and defense counsel showed acquiescence by replying, "Okay" instead of objecting or disagreeing with the trial court's reasoning. Finally,  when the trial court that "my issue with [juror 2] is the outside research," and "That you can't do" in the context of his reason for dismissing juror 2, defense counsel continued

to assert his agreement with the trial court by responding, "Right." Accordingly, defendant may not now argue that the trial court erred in replacing juror 6 with an alternate.

¶ 54    Even if, *arguendo*, the doctrine of invited error did not apply, the doctrine of forfeiture would apply. To preserve an issue for review, a defendant must object at trial and raise the issue in a posttrial motion. *Enoch*, 122 Ill. 2d at 186. Here, defense counsel suggested declaring a mistrial and then retaining both jurors 2 and 6, but he never advocated for the position that defendant currently asserts, which is that the trial court should have dismissed juror 2 while retaining juror 6. Accordingly, defendant has also forfeited this issue on appeal.

¶ 55                        C. Sufficiency of the Evidence

¶ 56    Finally, defendant argues that there was insufficient evidence to prove him guilty beyond a reasonable doubt. When examining the sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Collins*, 106 Ill. 2d 237, 261 (1985). The trier of fact has the responsibility to assess witnesses' credibility, weigh their testimony, resolve inconsistencies and conflicts in the evidence, and draw reasonable inferences from the evidence. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). We will not reverse a criminal conviction based on insufficient evidence unless the evidence is so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Gray*, 2017 IL 120958, ¶ 35.

¶ 57    Defendant points out that K.C. testified that the abuse occurred when Stacey was not home but her siblings were, and during periods of time that Thompson was also home. Defendant argues that it is contrary to human experience that a child molester would engage in such conduct with scant regard to the presence of others over a number of years. Defendant cites *People v. Vasquez*,

233 Ill. App. 3d 517, 527 (1992), where the court stated that "a conviction based upon testimony that is improbable, unconvincing, and contrary to human experience requires reversal."

¶ 58      Defendant's argument is not persuasive. Stacey was a manager for McDonald's from 2001 until early 2010, and defendant testified that Stacey worked from 10 a.m. to 7 p.m. Defendant testified that he worked until about 3 p.m. He also testified that he began to stay home and take care of the children in 2007 after he suffered a work-related injury, and that he began a landscaping business in summer 2008. Accordingly, there were large spans of time when defendant would have been home with K.C. without Stacey present. Although the other children were also at home, J.C. testified that all three kids spent most of the time in their own rooms when they were not at school. Moreover, K.C. testified that the abuse sometimes took place in defendant's room, which was in the basement. Thompson was in the home for only a little over a year, and she was taking care of her special needs baby while she was there. K.C. also testified to a few instances of abuse taking place outside of the home. We additionally note that although defendant denied ever removing K.C.'s clothing, Master testified that defendant forcefully did so and made K.C. stand in the corner of her closet on more than one occasion. Master also testified to a time that defendant made K.C. go to sleep naked. Accordingly, a rational trier of fact could have determined that defendant abused K.C. despite the presence of others in the house. *Cf. In re J.B.*, 2013 IL App. 3d 120137, ¶ 5 (the respondent admittedly had sexual intercourse with 12-year-old when his mother and other children were in the house).

¶ 59      We next address defendant's argument that the evidence was not sufficient to prove him guilty of all 10 counts of the indictment. Defendant points out that during the jury instruction conference, the prosecutor stated: "The victim did testify to distinguish some, but I don't think she gave five unique or different circumstances pertaining to each set." He said that there were "four

unique times to differentiate for the verdict form," but not a "fifth one," and he questioned what the trial court wanted him to do. The prosecutor further stated: "And then obviously, she testified it happened more than once in the rooms." The trial court replied that the counts I through V should simply be listed as vaginal penetration and counts VI through X listed as oral penetration.

¶ 60    Defendant argues that instead of dismissing the counts for "which the prosecutor could not find any support in the evidence," the trial court relied on the victim's testimony that it happened more than once in each room in support of the fifth count in each "set." He analogizes this case to *People v. Letcher*, 386 Ill. App. 3d 327, 328 (2008), where the court stated that the victim's testimony that the "offenses happened too many times to remember was too generic to show a specific number of offenses." The *Letcher* court concluded that record contained evidence sufficient to support only six of the eight counts of predatory criminal sexual assault of a child of which the defendant was convicted. *Id.*

¶ 61    The State responds that the prosecutor was referring to how many different circumstances occurred, but everyone present recognized that K.C. testified that many of the circumstances occurred multiple times. The State argues that this case is therefore sufficiently distinct from *Letcher*, as K.C. clearly described conduct, where it occurred, and a concrete minimum amount of times that it happened.

¶ 62    We agree with the State that the prosecutor's comments reveal that he was questioning how to phrase the jury instructions given that there were not five distinct locations for each type of contact, rather than questioning whether there was sufficient evidence for each count. Indeed, he stated: "And then obviously, she testified it happened more than once in the rooms."

¶ 63    We further conclude that there was sufficient evidence of 10 distinct acts of predatory criminal sexual assault, unlike in *Letcher*. Regarding the five counts alleging vaginal penetration,

K.C. testified that defendant had intercourse with her multiple times in her bedroom, which would be sufficient evidence of two counts. She testified that he had intercourse with her in his bedroom as well, and sometimes he would be on top of her and other times he would be standing next to the bed, in front of her. She testified that both positions occurred more than one time. Accordingly, these would equate to sufficient evidence of another four counts. Finally, she testified that they had intercourse in the landscaping trailer. Accordingly, there was sufficient evidence to support more than the five counts of vaginal penetration of which defendant was convicted.

¶ 64    Regarding oral penetration, K.C. testified that defendant had her suck his penis before and after intercourse in her bedroom, which occurred multiple times. This would equate to sufficient evidence of four counts. She testified that he also had her suck his penis in his bedroom multiple times, which would be sufficient evidence of two additional counts. K.C. further referred to defendant making her suck his penis when he was driving a truck and when they were in a different house that was being painted. There was therefore sufficient evidence to support more than the five counts of oral penetration of which defendant was convicted.

¶ 65    Defendant additionally argues that the State failed to prove beyond a reasonable doubt that K.C. was under 13 years when the abuse took place. Defendant argues as follows. The evidence showed that K.C.'s birthday was November 20, 2001, and that she began living with the Chrismans in January or February 2006. DCFS removed her on August 12, 2015, when she was almost 13 years and 9 months old. However, K.C. never provided a timeframe for the abuse, and the State never asked clarifying questions. Therefore, nothing in the record indicates that at least some of the conduct did not occur during the almost nine months after her 13th birthday that K.C. lived with defendant. Rather, her testimony that some of the conduct occurred in his landscaping trailer

and on his way to a job lends support to the abuse taking place when K.C. was older, as defendant started his lawn care business in 2008.

¶ 66     The State argues that because K.C. lived in the home for about eight years prior to her 13th birthday and testified that defendant began to abuse her when she was about six years old, the jury could reasonably infer that at least 10 instances of abuse occurred before she turned 13 in November 2014.

¶ 67     An essential element of the crime of predatory criminal sexual assault of a child is that the child was under 13 years of age when the act occurred. See 720 ILCS 5/11-1.40(a)(1) (West 2014). We conclude that there was sufficient evidence to prove defendant guilty beyond a reasonable doubt of the allegations of abuse that took place in the home. K.C. testified that defendant first kissed her when she was about six years old and that the vaginal and oral penetration took place at some point after that. K.C. further testified that the abuse occurred when Stacey was not home. The evidence showed that Stacey worked at McDonalds from 2001 to early 2010, during which time K.C. was under 13 years old. Defendant testified that Stacey worked from 10 a.m. to 7 p.m. and that he worked until about 3 p.m. until 2007. Based on this testimony, defendant would have had access to K.C. while Stacey was at work for many hours every weekday. Defendant also testified that he began to stay home and take care of the children in 2007 after he suffered a work-related injury until he began a landscaping business in summer 2008, which shows another period of time when K.C. was under 13 years old and defendant was taking care of the children without Stacey present. Stacey testified that she stayed home and took care of the kids after leaving McDonald's in early 2010. Accordingly, there was sufficient evidence that the abuse in the home took place when K.C. was less than 13 years old. Further, as discussed, there was sufficient evidence of at least six counts of vaginal penetration and six counts of oral penetration in the home,

even setting aside the incidents in the landscaping trailer, in the truck, and in the house that was being painted. Accordingly, viewing the evidence in the light most favorable to the State, a rational trier of fact could have found that K.C. was under 13 years old for all 10 counts of predatory criminal sexual assault of a child.

¶ 68                                        III. CONCLUSION

¶ 69    For the reasons stated, we affirm the judgment of the Boone County circuit court.

¶ 70    Affirmed.